IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

PETE WILLIAM CORN                                                                                    PLAINTIFF

      v.                    Civil No. 1:09-cv-01015

KEN JONES, Union County Sheriff;
CAPT. JOHN WILLIAMS, Union County
Criminal Justice Facility; LT. BASS;
DEPUTY GARY AARON; DR. SEALE; and
NURSE KELLY PEPPER                                                                                DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pete William Corn (hereinafter Corn) filed this civil rights action pursuant to 42 U.S.C. § 1983. Corn contends his constitutional rights were violated while he was incarcerated at the Union County Detention Center. Specifically, he contends his rights were violated when he was denied adequate medical care.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Harry F. Barnes, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation. Defendants Sheriff Ken Jones, Captain John Williams, Lt. Walter Bass, Deputy Gary Aaron, and Nurse Kelly Pepper filed a Motion for Summary Judgment (Doc. 15). Dr. Seale has also filed a Motion for Summary Judgment (Doc. 30). To assist Corn in responding to the Motions for Summary Judgment, a questionnaire was propounded (Doc. 38) by the Court. Corn filed a response to the questionnaire (Doc. 39) on August 5, 2010. The motion is now before me for issuance of this report and recommendation.

## I. Background

On November 6, 2008, Corn was booked into the Union County Detention Center (UCDC). *Plaintiff's Response* (Doc. 39)(hereinafter *Resp.*) at ¶ 1. He was released from the UCDC on June 22, 2009. *Id.* at ¶ 2(A). He was booked into the UCDC again on November 28, 2009. *Id.* at ¶ 2(B). While Corn concedes these dates are correct, he states the dates of his incarceration are not relevant to this case. *Id.*

When Corn was booked in on November 6, 2008, he alleges he told detention center personnel that he took a lot of medication. *Resp.* at ¶ 3(A). Since they asked this question, Corn thought he would see the medical staff automatically. *Id.* Corn states he was not told the jail rules or given a handbook setting forth the rules and procedures. *Id.* at ¶ 3(B) & ¶ 4(B). After several weeks, Corn mentioned to another inmate that he was waiting to be seen by the doctor. *Id.* Corn states he was then informed him he had to submit a sick call request in order to be seen. *Id. See also Resp.* at ¶ 4(A).

According to Corn, he has the following medical conditions: schizoaffective bi-polar type; slippage in the spine; hypertension; gastric esophageal reflux (GERD); and Rheumatoid Arthritis. *Resp.* at ¶ 3(C). Prior to his arrest, Corn took medication on a daily basis for each of these disorders. *Id.* When he was arrested, Corn states his medication was left in his vehicle. *Id.* Corn was asked how a delay in his receipt of medication affected his activities of daily living or his health. *Resp.* at ¶ 3(C). He responded:

> The slippage in my spine caused pain in my spine and caused my muscles in my back to be tight with muscle spas[]ms. The Rheumatoid Arthrit[is] caused a lot of pain and stiffness in all my joints. My Schizoaffective Bipolar-type caused me to see and hear things, to be very moody and stayed away from everyone. All I wanted to do was lay in bed to stay away from everyone and because the pain and stiffness. Then I wanted

>   to sleep all the time to stay away from the voices and visions. This caused me to gain
>   a lot of weight.

*Id.*

Dr. Seale is the appointed County Health Officer for Union County, Arkansas. *Seale Aff.* at ¶ 7. In his capacity as the Union County Health Officer, Dr. Seale provides medical care to inmates at the UCDC. *Resp.* at ¶ 8.

Corn submitted his first sick call request on November 17, 2008. *Resp.* at ¶ 5. He was seen by Dr. Seale on November 20th. *Id.* at ¶ 6. Corn gave a history of peptic ulcer disease and GERD. *Id.* at ¶ 9. Corn indicated that he had taken Ranitidine (Zantac) for these conditions and at times had to go to the emergency room for abdominal pain. *Id.* He also gave a history of low back pain. *Id.* at ¶ 10. He said that he had taken Lisinopril, Flexeril and Seroquel at various times while he resided in Texas. *Id.*

Corn indicates he also informed Dr. Seale that he had Rheumatoid Arthritis and schizoaffective bipolar type. *Resp.* at ¶ 9. Corn asserts he told Dr. Seale about all the medications he had been taking. *Id.*

Corn's blood pressure was 158/112 on his first visit. *Resp.* at ¶ 11. Dr. Seale therefore put Corn on a blood pressure medicine, Benazepril 10 mg. daily. *Id.* Dr. Seale also started Corn on Cimetidine 400 mg. twice a day for his peptic ulcer symptoms. *Id.*

Corn was next seen at sick call on January 8, 2009. *Resp.* at ¶ 12(A). He gave a history of low back pain for the past two years. *Id.* He said his physicians in Texas were considering surgery. *Id.* Corn also said he had taken Prednisone for Rheumatoid Arthritis. *Id.* at ¶ 12(B). He stated he had not had any Prednisone since November 6, 2008. *Id.*

Dr. Seale examined Corn and felt he had chronic lumbosacral back disease. *Resp.* at ¶ 12(C). Dr. Seale prescribed Parafon Forte DSC (Chlorzoxazone), a muscle relaxer, four times daily. *Id.* Dr. Seale avoided prescribing Prednisone due to the risk of causing a flare up of Corn's peptic ulcer. *Seale Aff.* at ¶ 4; *Resp.* at ¶ 12(D)(without knowledge to agree or disagree). With Corn's history of gastrointestinal disease, Dr. Seale believed taking Prednisone could have caused gastrointestinal bleeding and/or a gastro-intestinal perforation. *Id.* Corn asserts that he had not previously had any problems with Prednisone. *Resp.* at ¶ 12(d).

On January 27th, Corn submitted a grievance stating he was not receiving the following medications: Vicodin extra strength; Citalopram; Depakote; Prednisone; Methotrexate; Folic Acid and Flexeril. *Resp.* at 39. At the time this grievance was submitted, Dr. Seale states he did not prescribe these medications because he had no prior records indicating such medications had been ordered by another medical care provider. *Seale Aff.* at ¶ 14. Moreover, in Dr. Seale's opinion, Corn's medical conditions were being appropriately managed with other prescribed medications. *Id.*

However, Corn states that if the medical release he provided had been faxed in a timely manner Dr. Seale would have had these records. *Resp.* at ¶ 40. Corn states he signed the form on January 7th and it was not faxed until February 3rd. *Id.* Additionally, Corn states he never received any medication for his schizoaffective, bipolar type or to slow down his Rheumatoid Arthritis. *Id.* at ¶ 41. In Corn's opinion, Dr. Seale did not prescribe "half the medications that an ordinary doctor and specialist prescribed to me." *Id.* at ¶ 42. Corn further states that the medication that was prescribed "barely worked because it was cheaper medication." *Id.*

Corn was seen by Dr. Seale again on January 29th. *Resp*. at ¶ 13. Dr. Seale noted Corn had been coughing and sweating for about two weeks. *Id.* He also noted Corn wanted more muscle relaxants. *Id.*

Dr. Seale diagnosed Corn with an upper respiratory infection and prescribed Doxycycline, an antibiotic twice daily for one week. *Resp.* at ¶ 14. Dr. Seale also approved refills for Parafon Forte DSC and Cimetidine. *Id.*

Dr. Seale reduced the dosage of the muscle relaxers and told Corn that he did not see any indication that surgery for Corn's back was necessary but that a surgeon would have to make that decision. *Resp.* at ¶ 15. According to Dr. Seale, he also told Corn that Union County did not provide for elective surgical treatment of non-life threatening pre-existing surgical problems. *Seale Aff.* at ¶ 5. Corn states he was only told that Union County would not pay for the surgery. *Resp.* at ¶ 16.

On February 10th, Corn spoke with Lt. Bass and Nurse Pepper. *Resp.* at ¶ 46. Lt. Bass asked if there was something he could do to help Corn out since he said he had a problem with Dr. Seale. *Id.* Lt. Bass even offered to get Corn's medications out of his car. *Id.* Corn did not seem interested in this. *Id.*

Corn indicates he did not have a problem with Dr. Seale but had a problem "with his treatment." *Resp.* at ¶ 46. Corn states he asked to be placed on the same medications as he was on when he became incarcerated at the UCDC. *Id.* The reason he said he did not seem interested in having Lt. Bass get the medications out of his car is because he had already been told by Lt. Bass that there "was too much stuff in my car to do it" and he "figured it was just talk." *Id.*

Corn next saw Dr. Seale on April 2nd. *Resp.* at ¶ 17. Corn complained of right ear pain and itching. *Id.* Dr. Seale diagnosed Corn with otitis externa and prescribed Vosol HC drops. *Id.* Corn's

blood pressure was 146/102 so Dr. Seale increased Corn's blood pressure medication (Lotensin or Benazepril) to 10 mg. twice daily. *Id.*

Corn told Dr. Seale he had been on multiple medications prior to being in the UCDC and asked about restarting the medications. *Resp.* at ¶ 19. Dr. Seale had received some records from Corn's medical providers in Texas which showed he had received psychiatric medications in the past. *Id.* at ¶ 20. However, according to Dr. Seale, the records indicated Corn had been off the medications since March of 2008. *Seale Aff.* at ¶ 6. As Corn had done well without the medications, Dr. Seale did not feel Corn needed to be restarted on the medications. *Id.* According to Corn, Dr. Seale stated that he could not prescribe psychiatric medication and that Corn had to be a "patient of Regional Health Center to be seen by them." *Resp.* at ¶ 21. Corn also states again that he had his medication in the car when he was arrested. *Id.*

Corn was next seen at sick call on April 16th. *Resp.* at ¶ 22. Corn told Dr. Seale that he had only been receiving one Lotensin 10 mg. daily instead of twice daily as Dr. Seale had ordered. *Id.* The nurse assured Corn that she would fix the problem and he would start receiving the medication as ordered. *Id.* Corn told Dr. Seale he was having generalized discomfort in his hands, knees, and back. *Id.* at ¶ 23. Corn stated he had been diagnosed with Rheumatoid Arthritis. *Id.*

Corn was started on Arthrotec (diclofenac and misoprostol) 75 mg. twice daily. *Resp.* at ¶ 24. Arthrotec is an arthritis medication is one of the non-steroidal medications with the lowest incidences of gastrointestinal side effects. *Id.* Dr. Seale told Corn to watch for any problems with epigastric pain or distress. *Id.* Dr. Seale also Corn that he could not prescribe a number of the medications for Rheumatoid Arthritis because of Corn's past history of peptic ulcer disease and

GERD.  *Id.*  Dr. Seale refilled Corn's muscle relaxer, Parfon Forte DSC and increased it back to the original dosage of four times daily.  *Id.*

On June 4th, Corn was seen at sick call.  *Resp.* at ¶ 26.  He gave a history of vomiting and nausea which caused him to stop all his medications.  *Id.*  He said he was having generalized pain.  *Id.*

Dr. Seale examined Corn and found no edema or redness but Corn had pain with movement of the knees, elbows, and shoulders.  *Resp.* at ¶ 28.  Dr. Seale prescribed Darvon 65 mg. four times daily for pain.  *Id.*  Dr. Seale also started Corn on Prednisone, 5 mg. because he had received Corn's medical records from the University of Texas which indicated he had taken the medication in the past.  *Id.*  Dr. Seale told Corn that peptic ulcer symptoms were possible and he told Corn to contact the nurse as soon as possible if any of the problems occurred.  *Id.* at ¶ 29.  If any peptic ulcer symptoms flared up, Corn was told to stop the Prednisone immediately.  *Id.*  Dr. Seale also restarted Corn on Cimetidine 400 mg. twice daily.  *Id.* at ¶ 30.

Dr. Seale next saw Corn on June 11th.  *Seale Aff.* at ¶ 9; *Resp.* at ¶ 31 (without knowledge to agree or disagree).  Corn's blood pressure was under control at 126/88.  *Id.*  Corn complained about his left hand and elbow being "swollen and painful."  *Resp.* at ¶ 33.  According to Dr. Seale, he examined Corn and found generalized tenderness, minimal edema, and no erythema.  *Seale Aff.* at ¶ 9.  Corn agrees this is what Dr. Seale said but states he was in pain.  *Resp.* at ¶ 33.  Dr. Seale continued Corn's Prednisone prescription and gave him an injection of Decadron 4 mg. intramuscularly.  *Id.* at ¶ 35.

Dr. Seale did not see Corn after June 11th.  *Resp.* at ¶ 32.  Dr. Seale did not refer Corn to a surgeon or to any other specialist.  *Id.* at ¶ 43.  Between November of 2008 and June of 2009, Dr.

Seale asserts he did not find any joint deformity when he examined Corn. *Seale Aff.* at ¶ 10. Corn agrees this is what Dr. Seale reported. *Resp.* at ¶ 34. However, Corn asserts that before he was seen by Dr. Seale he had been treated by a rheumatologist who found joint deformity existed. *Id.*

Dr. Seale asserts he provided Corn with all the medical treatment that he believed was necessary and reasonable. *Seale Aff.* at ¶ 12. Corn maintains that Dr. Seale provided him with only the treatment the UCDC would pay for. *Resp.* at ¶ 36. Furthermore, Corn states Dr. Seale would not give him anything for pain, Prednisone, Methotrexate or psycho tropic medication until Corn filed his civil rights lawsuit. *Id.* at ¶ 38. Corn also maintains that there were times he did not receive the right medication. *Id.* at ¶ 37.

Corn was asked whether he contended a custom or policy of Union County resulted in his being deprived of his federal constitutional rights. *Resp.* at ¶ 44. He responded affirmatively and when asked to describe the custom or policy stated:

> Dr. Seale told me that he cannot prescribe sychotropic medication because the policy says that I have to go through South Arkansas Regi[o]nal Health Center. And the policy or custom to use lower cost medications. These deprived me of a safe and healthy environment. I was constantly in the mood to fight, but with my phy[s]ical condition I could not handle it. Being scared to be seriously injured.

*Id.*

Corn was asked to describe in detail how Dr. Seale exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 47. Corn replied:

> Dr. Seale refused to prescribe sychotropic medications or any medication to slow down the effects of the Rheumatoid Arthritic even after he received my records. He very well knew that I had these problems to because of the records and me. I received the most of my treatment and medication after he was aware of me filling out a § 1983.

*Id. See also Resp.* at ¶ 52 & page 28.

Corn was asked to describe in detail how Captain John Williams exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 48. He replied: "He did not do anything to help me even after he said he would help me in any way even after he knew the seriousness of my illnesses." *Id.*

Corn was asked to describe in detail how Lt. Bass exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 49. He replied: "He did not do anything to help me even after he said he would help me in any way even after he knew the seriousness of my illnesses." *Id.*

Corn was asked to describe in detail how Deputy Gary Aaron exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 50. He replied: "He refused to call the nurse after I complained of serious back pain and muscle spasisms." *Id.*

Corn was asked to describe in detail how Nurse Pepper exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 51. He replied: "She waited from 1-7-09 to 2-3-09 to fax the release of information form. She also refused to give me medications until after I filled a 1983." *Id.* *See also Resp.* at page 28.

On January 27, 2010, his cell was searched and multiple medications were found. *Resp.* at ¶ 2(C). Some of the pills belonged to another inmate. *Affidavit of Dr. Seale* at ¶ 11; *Resp.* at ¶ 2(D)(without knowledge to agree or disagree).

## II. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III.  The Arguments of the Parties

First, the UCDC Defendants argue Corn cannot establish the existence of a governmental policy, custom, or practice.  They, therefore argue there are no grounds on which they can beheld liable in their official capacities.  Second, the UCDC Defendants maintain there is no evidence that they exhibited deliberate indifference to Corn's serious medical needs.  They point out that Corn was seen on numerous occasions by medical personnel.  They further argue they complied with any directive of Dr. Seale with respect to Corn's care.

Dr. Seale argues he provided adequate and appropriate care and treatment for Corn's conditions.  Dr. Seale maintains there is absolutely no evidence of deliberate indifference on his part.

Corn argues he provided all necessary information regarding his various medical conditions and  medications when he was booked in.  Despite this, Corn asserts he was not referred to medical staff and did not know for several weeks that he had to submit a sick call request.  When seen, Corn

maintains he received no treatment for schizoaffective bipolar disorder and inadequate treatment for his Rheumatoid Arthritis. Further, Corn states he received most of his treatment and medication after Dr. Seale was aware Corn filed a civil rights lawsuit.

## IV.  Discussion

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.  In order to state a claim under § 1983, Plaintiff must allege that the Defendants acted under color of state law and that they violated a right secured by the Constitution. *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986). Keeping these general principles in mind, I turn to an examination of the claims asserted by Plaintiff and the Defendants' arguments in favor of summary judgment.

### *Official versus Individual Capacity Claims*

The UCDC Defendants maintain only official capacity claims have been asserted in the complaint and there is no proof of an unconstitutional custom or policy. Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of

> immunity available is one belonging to the entity itself. Id. 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. Id. 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989); *see also Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999)(in actions against officers, specific pleading of individual capacity is required to put public officials on notice that they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity"); *Egerdahl v. Hibbing Comm. Coll.*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

Plaintiff is proceeding *pro se* in this case. Understanding the differences between official capacity and individual capacity claims is at times difficult for even those with legal training . *See e.g., Vanhorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrued the differences between official and individual capacity claims and the immunities available). Given the duty of the Court to liberally construe *pro se* pleadings, the Plaintiff's request for a separate award

of damages against each Defendant and the fact that it does not appear Defendants will be unfairly prejudiced in anyway, I will construe the complaint as asserting both individual and official capacity claims against the Defendants.

### *Denial of Medical Care*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component:  'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 498 (8th Cir. 2008).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"This duty to provide medical care encompasses detainees' psychiatric needs." *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002)(citations omitted). *See also Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir.1995)("Prison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs"). Obviously, a psychiatric or mental condition can constitute a serious medical need and pose a risk of serious harm. *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).

In this case, Corn relies on the following to support his claim that Defendants exhibited deliberate indifference: (1) the UCDC Defendants were advised of the fact that he had schizoaffective bipolar disorder, Rheumatoid Arthritis, hypertension, GERD, and problems with his back and was on various medications when he was booked in on November 6, 2008; (2) he was not given a handbook, a copy of the jail rules, or orally advised regarding the sick call system; (3) he had been taking medications for each of these conditions prior to his incarceration and his prescription bottles were in his car when he was arrested; (4) Dr. Seale indicated he could not prescribe psychiatric medications but nothing was done to refer him to a doctor or facility who could determine if Corn needed medication; (5) the medication he was prescribed was not dispensed properly; and (6) the medications he was prescribed did nothing to lessen his severe pain.

The UCDC Defendants have introduced no exhibits or affidavits setting forth the Union County policy regarding medical care. Nothing has been submitted to show Corn was advised of the

rules applicable to inmate's requests for medical care. Nothing has been submitted indicating what the booking officers do with medical information received from an individual being booked in. There is no indication in this case that Defendants sought further information regarding Corn's medical or psychiatric conditions or his assertion that he was on various medications. There is no indication that the information was forwarded to medical staff or that any efforts were made to obtain medication for Corn. Clearly several of Corn's conditions are commonly treated with medication such as GERD, hypertension, and Schizoaffective disorder bipolar-type which is commonly treated with a combination of medications and counseling.[1]

While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." *Langford v. Norris*, No. 09-1862, 2010 WL 2813551 (8th Cir. July 20, 2010)(*citing Crooks*, 872 F.2d at 804)). By November 6th, Defendants had knowledge of Corn's medical condition and medications from his booking information. Nothing in the record indicates how the medical information obtained at booking was processed. It is reasonable to assume that Captain John Williams was either responsible for processing such information or responsible for training those who did so.

Similarly, I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged delays in the provision of medical care and prescription medications. County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff. Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners

---

[1] *See Schizoaffective Disorder*, http://www.mayoclinic.com/health/schizoaffective-disorder/DS00866 (last visited on 8/23/2010).

committed in his or her county, and he or she may appoint a jailer for whose conduct he or she shall be responsible").

With respect to Dr. Seale, I also believe there are genuine issues of fact as to whether he exhibited deliberate indifference to Corn's medical and psychiatric conditions. While Dr. Seale asserts Corn's records show he was taken off medication for schizoaffective bipolar disorder, Corn maintains that he was taking daily medication for this disorder and the medication was in his vehicle. The records Dr. Seale allegedly relied on are not before the Court. Thus, I am left with contradictory statements and no record evidence to support either statement. It also appears that there was no treatment, or treatment plan, for Corn's back condition.

The medication logs submitted with Dr. Seale's summary judgment motion begin in February 2009. No medication logs were submitted covering November to December of 2008 or January 2009. While the UCDC Defendants submitted a pharmacy record indicating medications were purchased for Corn during this time period, nothing indicates Corn received the medication or whether he received it on the prescribed basis. The medications purchased during this time frame were Cimetidine (used to treat GERD), Benazepril (high blood pressure medication), and Chlorzoxazone (used to relieve pain and stiffness caused by muscle strains and sprains).

With respect to Nurse Pepper, Corn maintains she waited nearly a month before faxing the medical release he had signed to obtain his records. If this was the only way Nurse Pepper was alleged to have exhibited deliberate indifference to Corn's serious medical needs, I would be inclined to grant summary judgment in her favor. *See e.g., Popoalii v. Correctional Medical Services*, 512 F.3d 488, 500 (8th Cir. 2008)("While defendants' actions, could have, and probably should, have been more vigilant in obtaining [plaintiff's] medical records . . . . Defendants' actions with regard to [plaintiffs] medical records, while regrettable, do not constitute deliberate indifference"). However,

Corn also contends she refused to given him medications until after he filed this lawsuit. This case was filed on March 19, 2009. As noted above, the medication logs do not start until February 2009, while the pharmacy records show the first prescription as filled on November 20, 2008. The Defendants have provided no information with respect to how medications are ordered for inmates, who prepares and keeps the medication logs, and who dispenses the medication.

With respect to Lt. Bass and Deputy Gary Aaron, Corn's conclusory allegations that they did not do enough to help him are insufficient to show there is a genuine issue of fact as to whether they exhibited deliberate indifference to his serious health needs. "Deliberate indifference is equivalent to the criminal law standard of recklessness–a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007)(internal quotation marks and citations omitted). Corn's mere disagreement with Lt. Bass's and Deputy Aaron's conduct does not rise to the level of deliberate indifference.

### V. Conclusion

I therefore recommend that the Motion for Summary Judgment (Doc. 15) filed by the UCDC Defendants be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to all claims against Lt. Bass and Deputy Aaron. In all other respects I recommend the motion be denied. Finally, I recommend that the Motion for Summary Judgment filed on behalf of Dr. Seale (Doc. 30) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are**

**reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of August 2010.

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE