IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

PETE WILLIAM CORN                                                                                    PLAINTIFF

        v.                              Civil No. 1:09-cv-01015

KEN JONES, Union County Sheriff;
CAPT. JOHN WILLIAMS, Union County
Criminal Justice Facility; and
NURSE KELLY PEPPER                                                                                 DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

    Pete William Corn (hereinafter Corn) filed this civil rights action pursuant to 42 U.S.C. § 1983. Corn contends his constitutional rights were violated while he was incarcerated at the Union County Criminal Justice Facility. Specifically, he contends he was denied adequate medical care.[1]

    Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Harry F. Barnes, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation. On April 20, 2011, an evidentiary hearing was held in this case. At the conclusion of the hearing, the matter was taken under advisement so that Corn's medical records could be produced by Defendants and this report and recommendation could be prepared.

**1. Background**

    On November 6, 2008, Corn was booked into the Union County Criminal Justice Facility (UCCJF). He was released from the UCCJF on June 22, 2009.

    At the hearing, the testimony of the following witnesses was heard: (1) Deputy Walter Bass; (2) Nurse Kelly Pepper; (3) Deputy Michael Wax; (4) Dr. James Seale; and (5) Pete Corn. For purposes of discussion, I will summarize the testimony of the witnesses.

---

[1] Dr. Seale, Lt. Bass, and Deputy Gary Aaron were all granted summary judgment on September 30, 2010 (Doc. 42 & Doc. 43).

**Deputy Walter Bass**

Bass testified he has worked at the UCCJF for five years which includes the time frame at issue in this case. In May of 2009, Bass assumed the position of interim jail administrator.

He did not receive a copy of the Arkansas County Sheriffs Procedure Manual (the Manual), *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 1. However, he did know there were jail rules and regulations that applied. Additionally, Bass testified he was familiar with Union County policies and procedures including those with regard to medical care. In fact, Bass testified that each employee is given a copy of the Union County Sheriff's Department Policy and Procedure Manual. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1.

Union County also has rules and regulations for inmates. *Defts' Ex.* 2. Bass testified that the ususal procedure was for the booking deputy to provide the inmate with a copy of the rules and regulations. However, he indicated there may have been times when, through oversight, or for security reasons, the inmates were not provided with copies.

If an individual is brought in to be booked but needs emergency medical attention, he would be transported to the hospital or taken to a doctor prior to booking. During the booking process, the individual is asked numerous questions including date of birth, address, social security number, etc. According to Bass, there is also a computer screen containing several medical questions that the individual is required to answer. If the individual takes medication for certain conditions, for example high blood pressure, he is asked where his medication is. If it is at his house, Bass testified the individual is provided with a phone free of charge to try to get the medication brought to the facility. According to Bass, usually if a person is taking medication on a daily basis, he will have the medication somewhere in his possession.

Bass testified inmates frequently use, or attempt to use, medical conditions to obtain release from the jail. If the inmate has a sufficiently serious medical condition, he will be sent to see the nurse. If the nurse is not there, she will be notified of the situation through e-mail.

Bass testified he is familiar with the sick call procedure. Bass indicated inmates were sometimes notified about the sick call procedure during booking. However, because the recidivist rate is so high, approximately eighty-five percent of the inmates, the majority of the incoming inmates already know about the process to be used to see the doctor or nurse. Inmates are to obtain a sick call slip and complete it. Bass did not know whether Corn had been in the UCCJF prior to November 8, 2008. During the relevant time, Dr. Seale saw inmates at the jail every Thursday. Thursday morning the inmates would be reminded that it was doctor call day and if they wanted to see the doctor they needed to fill out a sick call slip. Bass testified the reminder was done, as a courtesy, to ensure the inmates had the opportunity to see the doctor if they had a medical condition and to avoid the necessity of providing medical treatment at other times.

Bass indicated he would go down to the pod and talk to all the inmates. He talked to Corn numerous times about his issues but could not recall the first time they talked. Corn indicated he had a number of medical conditions including paranoid schizophrenia and high blood pressure. Bass also knew there was some problem with Corn's medication being lost or something of that nature. Bass indicated he allowed Corn to go to the nurse's station and attempt to contact family members to have his medication brought to the jail.

At one point, Bass asked Corn what he could do to assist Corn. Corn said Bass could go get Corn's medication out of his vehicle. Corn told Bass the medication was in a certain bag.

The vehicle had been towed, at the request of the El Dorado Police Department, to a salvage yard the night Corn was arrested. Bass contacted the police department and an officer went to the

-3-

salvage yard. According to Bass, the vehicle contained an unbelievable amount of items. It would have taken hours to go through everything. Bass believed the only medication that was found was seized because it was in a pill bottle without the prescription information on it.

### Nurse Kelly Pepper

Pepper testified she works as a nurse for the Union County Sheriff's Office and worked in this same capacity in 2008. When an inmate is booked in and says he is on medication but does not have the medication with him, Pepper testified they will check with the pharmacy or doctor in order to establish that the inmate was actually taking the medication. Until the proof of a valid prescription is obtained, the medication is not provided to the inmate. If the medical records obtained are recent, the doctor refills the prescription. If the prescription is older than six months, the doctor would need to see the inmate and evaluate his medical condition.

Pepper believes she had her first interaction with Corn in the latter part of November. She had no information regarding his medical conditions until he submitted a slip call slip on November 19th. He was seen by the doctor the following day.

She was present on that occasion and a number of other occasions when Dr. Seale saw Corn. Corn made clear that he had mental problems. He also complained of back pain and rheumatoid arthritis. Corn indicated he had been taking medication and had been seen at various facilities in several states. In February, Pepper testified she obtained some of Corn's prior records and kept the records so they would be available to Dr. Seale. In total, Pepper believes Corn saw Dr. Seale between ten and fifteen times.

Pepper testified they had difficulty in obtaining mental health care for inmates. The local mental health treatment facility will not treat any inmates unless they had been seen at the facility

within the last six months.  After six months, the files of any patients not seen during that time were closed.

Pepper stated she did not know what the doctor could prescribe for various conditions including mental health conditions. She merely follows the orders given. Pepper testified she verifies medication when it comes into the facility and makes sure it is dispensed to the inmates on the prescribed basis.  She provides instruction to the guards on how to dispense medication.

Jail records indicate the following prescriptions were filled for Corn: cimetidine for stomach problems; benazepril for high blood pressure; chlorzoxazon, a muscle relaxer; and arthrotec for rheumatoid arthritis. *Defts' Ex.* 3. Additionally, he was prescribed an antibiotic and acetic acid. *Id.* Corn was not provided with any medication for mental illness.

However, for a period of time he was placed in the juvenile pod because he wanted to be alone and was hearing voices.  While in the juvenile pod, Pepper dispensed his medication.

**Michael A. Wax**

Wax testified he is a deputy jailer at the UCCJF and works in the maximum security pod. Wax recalled Corn asking to be moved to a different pod because he was having problems.  To the best of his recollection, Wax believes he told Corn he would have to talk to Wax's supervisor.

Wax stated that Corn had a number of problems including hearing voices, not getting along with other people, wanting to be alone, and having nervous problems including the shakes.  Wax testified he passed this information along to the shift supervisor.

**Dr. Seale**

Dr. Steele testified he was a general practitioner until his retirement on December 31, 2010. In 2008 and 2009, his practice included seeing inmates at the UCCJF.

Dr. Seale was not familiar with the Arkansas County Sheriffs Procedure Manual. *Plff's Ex. 1*. He testified he treated inmates according to their physical or mental needs. While the Sheriff oversaw the facility, Dr. Seale testified that in medical matters he believed UCCJF personnel deferred to him. He testified that he treated inmates as he would his private patients.

Dr. Seale indicates that Sheriff Jones was always supportive and never tried to override one of his decisions. While he was always cost conscious, Dr. Seale testified that if an inmate needed a certain medication it would be obtained.

With respect to Corn in particular, Dr. Seale testified that he was not told what type of treatment to provide Corn. Similarly, he testified that he was not instructed to withhold certain types of treatment. No jail policy hindered Dr. Seale's ability to provide at least the initial mental health treatment. Dr. Seale agreed with Pepper's testimony that the biggest problem they had in providing mental health treatment was the refusal of Southern Arkansas Mental Health to see inmates unless they had been treated at the facility within the last six months. If an inmate had a serious enough problem, Dr. Seale indicated arrangements would have been made to get the inmate in the state hospital or in the University of Arkansas Psychiatric Medicine Department. On occasion, an inmate was released so that he could obtain needed mental health care. If he had felt Corn needed mental health medication, Dr. Seale testified he would prescribe the medication he felt was correct for Corn. If an inmate is doing well enough, Dr. Seale testified he would not prescribe any medication at the time. In his medical opinion, Dr. Seale stated that Corn did not need any mental health prescriptions.

Dr. Seale first saw Corn on November 20, 2008. Corn stated he had problems with peptic ulcer disease, reflux, and abdominal pain at times. Corn did not mention any other conditions. Corn indicated he had taken a number of different medications. Corn was started on a high blood pressure medication and a medication for his ulcer and reflux problems.

In January, Corn mentioned back problems, rheumatod arthritis, and also complained of mental health problems.  Dr. Seale would not place Corn on any medication for rheumatoid arthritis until he received medical records establishing Corn had previously been on the medication.  In April, Dr. Seale testified he put Corn on prednisone with trepidation because of his gastro-intestinal problems.  Dr. Seale warned Corn to stop the medication immediately if he had any type of gastro-intestinal problems.

### Pete William Corn

Corn testified he had been on numerous medications, immediately prior to his incarceration, which included: ranitidine for his stomach problems; methotrexate used to treat rheumatorid arthritis; citalopram, an anti-depressant; valproic acid, a mood stablizer; cyclobenzaprine, a muscle relaxer; prednisone, used to treat rheumatoid arthritis; benazepril, for high blood pressure; and hydrocodone, a pain medication.  *See Plff's Ex.* 2 (list of prescriptions filled on September 24, 2008).

Corn admitted he did not take these medications daily as prescribed.  When he was using controlled narcotics, he did not take his prescription medication.  He indicated he frequently had problems obtaining his medication and resorted to self medicating.

Corn testified his presciption medications were in his car.  When he was released from jail, Corn indicated he found the medication sitting on top of everything in easy view. Corn maintains he should have been provided with mental health services, hydrocodone, or a stronger muscle relaxer.

Initially, Corn testified he did not tell jail officials about his mental heath problems.  However, between being booked in and January, 2009, Corn testified his mental health deteriorated.  He stated he was getting stressed out, hearing voices, seeing things, was paranoid that people were talking about him, had trouble concentrating, had racing thoughts, and anger issues.

Corn testified he was seen by Dr. Seale twelve to fifteen times during his incarceration at the UCCJF. Corn stated that when he was booked in he was not told that he had to complete a sick call slip to see the doctor. He was waiting to be seen based on the medical information he provided upon booking. During the first part of his stay, Corn testified there were no weekly reminders about doctor call.

With respect to Sheriff Jones, Corn argues he is liable because he has the final say so on anything having to do with the jail and is the policy maker. With respect to Williams, Corn maintains he had oversight of the facility and was supposed to pass information up the chain of command. Corn testified that he talked to Williams a number of times about the problems he was experiencing and that nothing was being done to help him. Finally, with respect to Pepper, Corn states she waited about three weeks after he provided the needed information about medical care providers before she contacted the providers to obtain his records. Additionally, he believes she did not try to help him with the medical and mental problems he was having and did not relay the information about the problems he was experiencing to Dr. Seale.

As a result of not having mental health medications, Corn testified he was getting into fights and arguments. As soon as he was released from jail, Corn indicated he was restarted on mental health medication.

### 2. Discussion

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted). "It is well established that deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *Langford v. Norris*, 614 F.3d 445, 459

(8th Cir. 2010)(internal quotation marks and citation omitted).  In this circuit, it is settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011)(internal quotation marks and citation omitted).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

"This duty to provide medical care encompasses detainees' psychiatric needs." *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002)(citations omitted). *See also Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir.1995)("Prison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs").  Obviously, a psychiatric or mental condition can constitute a serious medical need and pose a risk of serious harm.  *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).

Keeping the applicable principles in mind, I turn to an examination of the evidence in this case.  Although information was taken about Corn's medical conditions when he was booked in,

there is nothing to suggest this information was conveyed to Pepper. Pepper testified the first interaction she had with Corn was following his submission of a sick call slip on November 19th. Thereafter, Corn was seen by Dr. Seale on multiple occasions. The fact that it took Pepper awhile to obtain Corn's medical records did not prevent, or delay, Corn's receipt of care from Dr. Seale. Moreover, on the evidence before me, her actions in this regard do not constitute deliberate indifference. *See e.g., Popoalii v. Correctional Medical Services*, 512 F.3d 488, 500 (8th Cir. 2008)("While defendants' actions, could have, and probably should, have been more vigilant in obtaining [plaintiff's] medical records . . . . Defendants' actions with regard to [plaintiffs] medical records, while regrettable, do not constitute deliberate indifference"). Dr. Seale testified he prescribed the medications he believed necessary.

While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." *Langford v. Norris*, 614 F. 3d 445, 460 (8th Cir. 2010)(*citing Crooks*, 872 F.2d at 804)); *see also Schaub v. VonWald*, 638 F.3d 905, 920 (8th Cir. 2011)(when prison official knows there is a substantial risk of serious harm to the inmate but does nothing the inaction can constitute deliberate indifference). Supervisors can be held liable "for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). "Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989)(citation omitted).

Neither Sheriff Jones or Williams were medical personnel or involved in the treatment of inmates' medical needs. Although Corn disagrees with the treatment he received from Dr. Seale, the record is devoid of any evidence suggesting Corn's serious medical needs were not being adequately

treated or that Sheriff Jones or Williams denied, or delayed, Corn's access to medical care or intentionally interfered with the treatment once prescribed. *Orr v. Larkins*, 610 F.3d 1032, 1033 (8th Cir. 2010). Without such evidence, Defendants cannot be found to be deliberately indifferent to Corn's serious medical needs.

### 3. Conclusion

I therefore recommend that judgment be entered in the Defendants' favor and the case be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **18th day of July 2010.**

                                    /s/ Barry A. Bryant
                                    HON. BARRY A. BRYANT
                                    UNITED STATES MAGISTRATE JUDGE